IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| CONSTANCE SEAY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 19-CV-00474-GKF-JFJ |
| ) | |
| WAYNE WEAVER and ) | |
| WW FUNDING GROUP, INC., ) | |
| ) | |
| Defendants. ) | |
| ) | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

On June 2, 2021, this matter came before the court for non-jury trial on plaintiff Constance Seay's claims against defendants Wayne Weaver and WW Funding Group, Inc. Seay asserts claims for breach of contract and fraud/deceit. Having heard the evidence, the court enters the following Findings of Fact and Conclusions of Law.

**I.    Findings of Fact**

1. Seay is a citizen of a different state than Weaver and WW Funding Group, Inc. [Doc. 44, p. 3, ¶ IV.A.].

2. Weaver has a corporation under the name of WW Funding Group, Inc. [Doc. 54, p. 13:6-8]. WW Funding Group, Inc. had no role in negotiating, designing, or obtaining the relevant insurance policy. [*Id.* at p. 60:12-14]. Weaver does business as Wayne Weaver. [*Id.* at p. 13:9-10].

3. A substantial part of the events giving rise to the claims occurred within Tulsa County, Oklahoma in the Northern District of Oklahoma. [Doc. 54, p. 30:16-24].

4. Seay conducts business in Tulsa, Oklahoma. [Plaintiff's Trial Exhibit 3; Doc. 54, pp. 71:15 to 72:5, 73:25 to 74:11].

        *A.*      *Facts Relevant to Contract Claim*

5. In 2015, Seay and Weaver agreed to work together to obtain a $60 million life insurance policy for Seay's friend and client, Paula Marshall. [Doc. 44, p. 4, ¶ IV.C.; Doc. 54, p. 73:4-6].

6. Seay and Weaver agreed to split commissions earned as a result of the issuance of the life insurance policy, with both Seay and Weaver receiving 50% of the commissions. [Doc. 44, p. 4, ¶ IV.D.; Plaintiff's Trial Exhibit 2]. To that end, Seay and Weaver executed document titled, "Producer Commission Information." [Plaintiff's Trial Exhibit 2]. The document includes no reference to WW Funding Group, Inc. [*Id.*].

7. At the time the policy was issued, Weaver was a member of First Financial Resources (FFR), a producer group. [Doc. 44, p. 4, ¶ IV.F.]. As a FFR member, Weaver paid dues. [Doc. 54, p. 22:12-25; Plaintiff's Trial Exhibit 4]. Seay was not a FFR member. [Doc. 44, p. 4, ¶ IV.F.]. Accordingly, Seay did not pay dues to FFR. [Doc. 54, p. 22:12-18].

8. Prior to issuance of the life insurance policy, Seay placed her contract under Weaver's contract with FFR. [Doc. 44, p. 4, ¶ IV.G.]. Weaver admitted that, prior to the life insurance policy being issued, he learned that Seay had submitted herself as a subagent under his contract with FFR. [Doc. 54, p. 32:2-8, 62:16-20]. Seay's understanding was that she could not unilaterally affiliate with FFR due to her relationship with Weaver; rather, Weaver had to approve the affiliation. [Doc. 54, pp. 78:16 to 80:4].

9. The life insurance policy was issued by Pacific Life on October 25, 2015. [Doc. 44, p. 4, ¶ IV.E.; Plaintiff's Trial Exhibit 1].

10. Between November 15, 2015 and February 22, 2016, Pacific Life paid to FFR the total sum of $362,704.24 as a result of the issuance of the life insurance policy. [Doc. 44, p. 4, ¶ IV.H.].

11. Upon receipt of the funds, FFR paid the $362,704.24 to Weaver. [Doc. 44, p. 4, ¶ IV.I.].

12. The monies paid to Weaver were re-deposited to WW Funding Group, Inc. [Doc. 54, p. 67:5-11].

13. If Seay had not placed her contract under Weaver's contract, Pacific Life would have paid only half—or $181,352.12—to FFR. [Doc. 44, p. 4, ¶ IV.J.]. Weaver knew that, once Seay became a subagent, he would receive double the amount of override commission that he otherwise would have received if she was not a subagent. [Doc. 54, p. 63:12-16].

14. Seay learned of the payments by Pacific Life to FFR, and ultimately to Weaver, in the Fall of 2018. [Doc. 44, p. 4, ¶ IV.K.].

15. Weaver did not pay Seay half of the $362,704.24 payment. [Doc. 54, pp. 39:19 to 40:3, 83:8-20].

16. Weaver contends that he agreed only to a 50-50 split of "agent" commissions, not overrides. [Doc. 54, pp. 25:7 to 28:12]. However, the box in the "Producer Commission Information" form executed by Seay and Weaver that identifies the percentage of commission to be shared by each producer does not limit commission to "agent commissions." [Plaintiff's Trial Exhibit 2; Doc. 54, p. 27:10-17]. Instead, the box is labelled "Commission %." [*Id.*].

17. Plaintiff's Trial Exhibit 6, a Pacific Life document dated November 20, 2015, illustrates the first payment made by Pacific Life to FFR related to the Marshall policy. [Plaintiff's Trial Exhibit 6]. The document specifies a 50% split between Seay and Weaver. [*Id.*]. In a column titled "Comm.," which Weaver testified means "commission," Pacific Life designated $160,622.57 and $4.50 as being attributed to Seay and $160,622.57 and $4.50 as being attributed to Weaver. [*Id.*; Doc. 54, pp. 34:7 to 37:8].

18. Likewise, Plaintiff's Trial Exhibit 5 illustrates a second payment made from Pacific Life to FFR in February of 2016 related to the Marshall policy. [Plaintiff's Trial Exhibit 5; Doc. 54, p. 38:12-22]. The document also specifies a 50% split between Seay and Weaver. [Plaintiff's Trial Exhibit 5]. In the "Comm." (commission) column, Pacific Life designated $0.64 and $20,724.41 as being attributed to Seay and $0.64 and $20,724.41 as being attributed to Weaver. [Plaintiff's Trial Exhibit 5; Doc. 54, pp. 38:23 to 39:8].

19. The commission payments illustrated in Plaintiff's Trial Exhibit 5 and Plaintiff's Trial Exhibit 6 were paid as a result of the issuance of the Marshall insurance policy and as a percentage of the premium. [Doc. 54, p. 67:12-21].

20. Additionally, on November 30, 2015, Weaver executed a document entitled "Supplemental Commission Repayment Agreement" related to the Marshall life insurance policy. [Plaintiff's Trial Exhibit 9]. The Agreement, which is between FFR and Weaver, states: "Unless stated otherwise, reference to 'commission' includes overrides and the like." [*Id.* at p. 1]. The document includes no reference to WW Funding Group, Inc. *See generally* [Plaintiff's Trial Exhibit 9].

21. Commissions, including overrides, are paid by the insurance carrier as a percentage of the premiums paid by the insured. [Doc. 54, pp. 16:14-22, 67:12-21, 101:14 to 102:5].

22. FFR does not restrict its members as to what they do with monies received from FFR and nothing precludes FFR members from reaching an agreement with a non-FFR member to share in the payments. [Doc. 54, p. 102:14-19].

   B.   *Facts Relevant to Fraud Claim*

23. Both Seay and Weaver testified that the co-agency relationship was relatively equal. *See* [Doc. 54, pp. 31:8-19, 95:3-12]. Seay characterized she and Weaver as "partners." [Doc. 54, p. 91:17-18].

- 3 -

24. Seay and Weaver never discussed the additional override commission that would be paid from the issuance of the insurance policy because Seay placed the contract under Weaver. [Doc. 54, pp. 29:19-25, 59:20-22, 63:12-22, 76:20-24, 84:11-17, 88:1-19].

25. Seay made the decision to place her contract under Weaver's after a conversation with Timothy Olsen, Pacific Life Managing Regional Vice President for north Texas, Oklahoma, Arkansas, Tennessee, North Carolina, South Carolina, and northern Louisiana. Seay testified that she contacted Mr. Olsen before the life insurance policy was issued and asked him whether there was a way for her to maximize her compensation. Olsen suggested that, in light of her partnership with Weaver, Seay place her contract under Weaver's contract. [Doc. 54, p. 78:3-15, 87:19-25; Plaintiff's Trial Exhibit 24, pp. 6:5-11]; *see also* [Plaintiff's Trial Exhibit 24, pp. 9:5 to 12:23].

26. Seay never confirmed with Weaver what Olsen had told her regarding the FFR overrides. [Doc. 54, p. 88:17-19].

27. Seay testified that she trusted Olsen when he said that she could maximize her compensation by foregoing the leading edge bonus of $60,000 and putting her contract under Weaver's contract. [Doc. 54, p. 91:10-15].

28. Prior to the issuance of the life insurance policy, Seay never inquired as to the exact amount of the anticipated override payments. [Doc. 54, pp. 88:20-23, 91:7-9]. Seay believed they would not be paid until the fifth year and did not inquire until October, 2018 as to the amount of the overrides or when they may be paid. [Doc. 54, pp. 81:12 to 82:13].

29. Weaver testified that, when Seay contacted him in October of 2018 to discuss the override payments, he did not tell her the amount of the override payments that he had received. [Doc. 54, pp. 44:2 to 45:3].

30. Seay testified that, at the time of the relevant conduct, she was aware of producer groups and that their compensation package was different. [Doc. 54, pp. 85:18 to 86:6]. Seay had also represented Pacific Life for years and was aware of their compensation structure, including that, for sizeable policies, there were ways to maximize compensation. [Doc. 54, pp. 86:21 to 87:9].

31. Seay testified that she was capable of selling and designing the life insurance policy on her own, and could have accomplished the premium financing without Mr. Weaver's assistance. [Doc. 54, pp. 94:8-10, 16-19]. Further, Seay has over thirty (30) years experience in life insurance with estate planning. [Doc. 54, p. 71:15-20].

## II. Conclusions of Law

### A. Conclusions Related to Jurisdiction

1. District courts "have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of different states." 28 U.S.C. § 1332(a)(1).

2. Subject matter jurisdiction exists as Seay seeks damages totaling $181,352.12—an amount exceeding $75,000.00—and Seay is a citizen of a different state than Weaver and WW Funding. 28 U.S.C. § 1332(a)(1); *see also* [Doc. 44, p. 3, ¶ IV.A.].

3. "To obtain personal jurisdiction over a nonresident defendant in a diversity action, a plaintiff must show that jurisdiction is legitimate under the laws of the forum state and that the exercise of jurisdiction does not offend the due process clause of the Fourteenth Amendment." *Benton v. Cameco Corp.*, 375 F.3d 1070, 1075 (10th Cir. 2004) (quoting *Soma Med. Int'l v. Standard Chartered Bank*, 196 F.3d 1292, 1295 (10th Cir. 1999)). "Where, as in Oklahoma, the state long arm statute supports personal jurisdiction to the full extent constitutionally permitted, due process principles govern the inquiry." *Shrader v. Biddinger*, 633 F.3d 1235, 1239 (10th Cir. 2011).

4. Personal jurisdiction exists over the parties. [Doc. 44, p. 3, ¶ IV.B.].

### B. Conclusions Related to Breach of Contract Claim

5. "[B]ecause this is a diversity case, '[the court must] ascertain and apply [Oklahoma] law such that we reach the result that would be reached by [an Oklahoma] court.'" *Martinez v. Angel Expl., LLC*, 798 F.3d 968, 973 (10th Cir. 2015) (quoting *McIntosh v. Scottsdale Ins. Co.*, 992 F.2d 251, 253 (10th Cir. 1993)).

6. Under Oklahoma law, the elements of a breach of contract claim are: "(1) the formation of a contract, (2) breach of the contract, and (3) damages as a result of that breach." *Cates v. Integris Health, Inc.*, 412 P.3d 98, 103 (Okla. 2018).

7. "A breach of contract is a material failure of performance of a duty arising under or imposed by agreement." *Lewis v. Farmers Ins. Co.*, 681 P.2d 67, 69 (Okla. 1983).

8. Plaintiff satisfies the first element as to Weaver because Seay and Weaver formed a contract to split commissions earned as a result of the issuance of the life insurance policy 50/50.

9. "A contract's terms are to be given their plain meaning." *Am. Biomedical Grp., Inc., v. Techtrol, Inc.*, 374 P.3d 820, 826 (Okla. 2016); *see also* Okla. Stat. tit. 15, § 160.

10. Given its plain meaning, "commission" means "[a] fee paid to an agent or employee for a particular transaction, [usually] as a percentage of the money received from the

transaction." *Black's Law Dictionary* (11th ed. 2019); *see also Oxford English Dictionary* (3d ed. 2015) ("Payment, or a payment, for services or work done as an agent in a commercial transaction, typically a set percentage of the value involved.").

11. The $362,704.24 paid by Pacific Life to First Financial Resources plainly constitutes "commission," because the monies were paid as a percentage of the premiums paid by Marshall.

12. Weaver argues that a distinction exists between "overrides" and "commissions," but he executed the Supplemental Commission Repayment Agreement with FFR that defines "commission" to include "overrides." [Plaintiff's Trial Exhibit 10 at p. 1]. And Pacific Life treated the $362,704.24 as commission. [Plaintiff's Trial Exhibit 5 and Plaintiff's Trial Exhibit 6].

13. Weaver received override commissions in the total amount of $362,704.24, but did not pay Seay her fifty percent. Accordingly, Weaver breached the contract to split 50/50 the commissions earned related to the Marshall insurance policy.

14. However, generally, "contracts are binding only upon those who are parties thereto, and are enforceable only by the parties to a contract." *Drummond v. Johnson*, 643 P.2d 634, 639 (Okla. 1982) (internal footnote omitted).

15. "[A] corporation is regarded as a legal entity, separate and distinct from the individuals comprising it." *Fanning v. Brown*, 85 P.3d 841, 846 (Okla. 2004).

16. Weaver executed the contract with Seay, as well as the Supplemental Commission Repayment Agreement, in his individual capacity and not on behalf of WW Funding. Because Weaver is separate and distinct from WW Funding, WW Funding was not a party to the agreement to split commissions. WW Funding therefore is not liable for breach of contract.

   C.   *Conclusions Related to Fraud and Deceit*

17. A deceit under Oklahoma law includes: (1) the assertion, as a fact, of that which is not true, by one who does not believe it to be true; (2) the suppression of a fact by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact; and (3) a promise made without any intention of performing. Okla. Stat. tit. 76, § 3; OUJI 18.6.

18. "Fraud is never presumed, but must be proven by clear and convincing evidence." *Tice v. Tice,* 672 P.2d 1168, 1171 (Okla. 1983).

19. Fraud/deceit by false representation requires proof that "the defendant made a material representation that was false, that he knew when he made the representation that it was false, and that he made it with the intention that it should be acted upon by plaintiff, and that plaintiff acted in reliance upon it and thereby suffered detriment." *Silk v. Phillips*

*Petroleum Co.*, 760 P.2d 174, 176-77 (Okla. 1988); *see also* Okla. Stat. tit. 15, § 58; OUJI 18.1. "Fraud is never presumed, but must be proven by clear and convincing evidence." *Tice v. Tice,* 672 P.2d 1168, 1171 (Okla. 1983).

20. Seay argues that Weaver committed fraud by deceiving her into believing that he would split the Pacific Life commissions, and refusing to do so. However, Seay and Weaver never discussed the override commissions that would be paid from the issuance of the insurance policy as a result of Seay placing her contract under Weaver's. Thus, Weaver made no false representations with respect to overrides and Seay fails to establish fraud by false representation.

21. Fraud and deceit may also exist where a party has a duty to disclose a material fact, but fails to do so. *Silk,* 760 P.2d at 179; *see also* Okla. Stat. tit. 15 § 59; OUJI 18.2. "[T]he first question is always whether there was a duty upon the actor to disclose the whole truth." *Sutton v. David Stanley Chevrolet, Inc.,* 475 P.3d 847, 854 (Okla. 2020). "In determining whether there is a duty to speak, consideration must be given to the situation of the parties and the matters with which they are dealing." *Silk*, 760 P.2d at 179.

22. Seay argues that she and Weaver had a relationship built on their agreement to combine their efforts to place the policy and split the commission, and that Weaver's failure to inform Seay of the payments he received was a violation of a duty owed to his co-agent. A person has a duty to disclose a known material fact when:

    (1) [*He/She*] and the other person are in a [*confidential/fiduciary*] relationship; or
    (2) [*He/She*] has stated another fact which was true at the time [*he/she*] stated it but which subsequently became untrue, and [*he/she*] knows the other person is acting under the impression that the fact as originally stated is still true; or
    (3) [*He/She*] states other facts which are true but which [*he/she*] knows will create a false impression of the actual facts in the mind of the other person if the material fact is not disclosed; or
    (4) [*He/She*] knows by [*his/her*] own ambiguous words or conduct [*he/she*] has created a false impression of the actual facts in the mind of the other person; or
    (5) [*He/She*] knows the fact is peculiarly within [*his/her*] knowledge and the other person is not in a position to discover the fact for [*himself/herself*]; or
    (6) [*He/She*] has previously represented the fact to be otherwise with an honest belief in its truth, and afterwards learned that the actual fact was other than as first represented.

    [OUJI 18.5].

23. Under Oklahoma law, "[f]iduciary or confidential relationship has a broad meaning that includes legal, contractual, formal, and informal relations and exists when one person trusts and relies upon another. Such a relationship exists when one person acquires influence over another such that the influenced allows the influencer to substitute his or her will for the influenced's own." *Horton v. Hamilton,* 345 P.3d 357, 364 (Okla. 2015) (internal citation omitted). The Tenth Circuit has suggested that "Oklahoma law would recognize a

fiduciary duty arising out of a commercial contract if the transaction involved facts and circumstances indicative of the imposition of trust and confidence, rather than facts and circumstances indicative of an arms length commercial contract." *Quinlan v. Koch Oil. Co.,* 25 F.3d 936, 942 (10th Cir. 1994).

24. As referenced in paragraph 22 above, Seay points to the co-agent relationship between herself and Weaver. However, the evidence does not establish that a fiduciary or confidential relationship existed so as to require disclosure. Seay testified that that she and Weaver were partners. Seay further testified that she was capable of structuring the insurance policy and accomplishing the premium financing independently based on her years of experience. The evidence does not establish that Weaver acquired influence over Seay such that Seay allowed Weaver to substitute his will for Seay's. These facts and circumstances are indicative of an arms-length commercial transaction, and no confidential/fiduciary relationship arose.

25. The evidence also fails to establish that the amount of the override commission payments or timing of the payments was peculiarly within Weaver's knowledge, such that Seay was not in a position to discover the facts herself. Seay testified that she and Weaver never discussed the additional monies that would be paid from issuance of the insurance policy as a result of placing her contract under Weaver's. Seay did not confirm what Olsen had told her with Weaver and she did not inquire as to the exact amounts of the override payment. Rather, Seay relied upon *Olsen's* representations made prior to the issuance of the policy related to the override payments. Based on the evidence presented, it is clear that Seay could have approached Weaver prior to the issuance of the policy regarding the override payments. She simply chose not to do so.

26. Additionally, Seay did not inquire as to when the overrides would be paid or the amount owed prior to 2018. Although Seay testified she did not think it was necessary to inquire because she thought the extra money would be paid in the fifth year, Seay does not establish that she *could not have* discovered the time table and amounts, had she asked either Pacific Life or Weaver. Further, there is no evidence that Weaver created the false impression that the overrides would not be paid until the fifth year.

27. Seay also argues that, after the policy was issued, Weaver deceived her in November, 2015 and February, 2016 by concealing the fact that he had received twice the override commissions he would have received had Seay not placed her contract under his, and by refusing to answer her questions in 2018 about how much he had received. However, Seay fails to show that she acted in reliance on those post-policy issuance concealments to her detriment. *See* OUJI 18.2 (a plaintiff must show that the defendant concealed or failed to disclose a past or present fact with the intention that it should be acted upon by plaintiff; that plaintiff acted in reliance upon it; and that plaintiff thereby suffered injury).

28. Finally, as to WW Funding, there is no evidence that WW Funding made any representation to Seay or that Weaver made any representation in his capacity as an officer of WW Funding. Rather, Weaver testified that he does business as Wayne Weaver. Accordingly, WW Funding did not commit fraud or deceit.

29. Nor can WW Funding be liable for constructive fraud or deceit, as no relationship existed between Seay and WW Funding.

   D.   Remedies

30. "The measure of damages for breach of contract is the amount that would place the aggrieved party in the position [she] would have occupied had the breach not occurred." *Sun Ridge Invs., Ltd. v. Parker*, 956 P.2d 876, 878 (Okla. 1998); *see also* Okla. Stat. tit. 23, § 21; OUJI 23.51 (under Oklahoma law, the general measure of damages for a breach of contract is "the amount of money that is needed to put [plaintiff] in as good a position as [she] would have been if the contract had not been breached").

31. As previously stated, Weaver breached the contract to evenly split commissions earned as a result of the issuance of the Marshall insurance policy by failing to pay Seay her 50% of the total commission sum of $362,704.24. Pursuant to the contract, Seay was owed $181,352.12.

32. Weaver argues that an award of $181,352.12 would place Seay in a better position under the contract because, unlike Weaver, Seay did not pay dues to First Financial Resources. Weaver asks the court to reduce the award by the "membership dues expended by Weaver during the period in which a chargeback on the policy could have occurred." [Doc. 56, p. 12]. However, there is no evidence that Seay agreed to share a portion of the FFR dues. In fact, Seay testified that she and Weaver never discussed his First Financial Resources dues. [Doc. 54, pp. 91:19 to 92:7]. Further, George William Imhoff, CEO of First Financial Resources, testified that FFR members were not restricted in what they do with overrides received and could reach an agreement with a non-FFR member to share in those payments. [Doc. 54, p. 102:14-19]. Thus, First Financial Resources did not require a non-member to shoulder part of the dues burden. Weaver offers no additional evidence or legal authority, and the court is not persuaded.[1] An award of damages of $181,352.12 on the breach of contract claim is therefore reasonable and appropriate.

33. Prejudgment interest is appropriate where the amount of damages is a sum certain. *See* Okla. Stat. tit. 23, § 6 ("Any person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day[.]"). In this case, damages are capable of being made certain based on the parties' stipulation that, between November 15, 2015 and February 22, 2016, Pacific Life paid to First Financial Resources the total sum of $362,704.24, of which Seay was owed fifty percent.

---

[1] Additionally, the court notes that Weaver's argument assumes that the entirety of the annual dues would be charged against the override payments related to the Marshall insurance policy. However, the evidence indicates that payment of annual dues entitled First Financial Resources members to enhanced compensation on all policies with various companies. [Doc. 54, pp. 50:15 to 51:17].

34. The statutory rate of interest is six percent (6%) absent a contractual rate of interest. Okla. Stat. tit. 15, § 266. The commission agreement includes no contractual prejudgment interest rate and therefore the six percent statutory rate applies. Seay is entitled to an award of prejudgment interest totaling $61,506.27. The interest was calculated at 6% interest on $160,622.57 from November 18, 2015 and on $20,724.43 from February 22, 2016.

In summary, plaintiff Constance Seay is entitled to judgment in her favor against defendant Wayne Weaver in the amount of $181,352.12, plus prejudgment interest at the rate of six percent (6%) totaling $61,506.27, on the breach of contract claim, plus applicable post-judgment interest at a rate of the legal rate of 0.08% to be applied from the date of entry of this Judgment.

However, plaintiff Constance Seay fails to satisfy her burden of proof to demonstrate that defendant WW Funding Group, Inc. breached the contract, or that defendants Wayne Weaver and WW Funding Group, Inc. committed fraud/deceit. Accordingly, defendant Wayne Weaver is entitled to judgment on plaintiff's fraud/deceit claim and defendant WW Funding Group, Inc. is entitled to judgment on plaintiff's breach of contract and fraud/deceit claims.

DATED this 23rd day of July, 2021.

GREGORY K. FRIZZELL
UNITED STATES DISTRICT JUDGE